**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ANTHONY T. NELSON,                    )
                                      )
              Petitioner,             )          3:09-cv-00742-RCJ-VPC
                                      )
vs.                                   )          **ORDER**
                                      )
E.K. McDANIEL, *et al.*,              )
                                      )
              Respondents.            )
_____/

        This action is a *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254,

by a Nevada state prisoner.  This matter comes before the Court on the merits of the petition.

**I.  Background**

        On direct appeal, the Nevada Supreme Court found the following facts were determined at

trial:

            Carolyn Paquette and her friends, Jason Minkler and Alisha Chugg,
            were driving to Paquette's condominium after spending the evening at
            a club.  As they entered Paquette's gated community, the group noticed
            that another vehicle followed them into the community before the
            gates closed.  Minkler stopped the vehicle in front of Paquette's
            condominium; Paquette exited the vehicle and approached the front
            door to her home.

            A black two-door vehicle with a red stripe and two people inside
            stopped behind Paquette.  A man quickly exited the vehicle,
            approached Paquette, and demanded her purse.  Paquette asked the

man if he was kidding.  The man replied that he was not kidding and held a handgun in front of Paquette's face.

Minkler and Chugg exited their vehicle.  Chugg ran towards the man and inquired what was happening, but turned around and returned to her vehicle when the man displayed the gun to her.  Minkler approached the man, pulled out his cell phone, and began dialing 911. After taking Paquette's purse, the gunman and the driver quickly drove out of the complex.

Shortly after the incident, an officer arrived on the scene and obtained statements from Paquette, Minkler, and Chugg.  At trial, the officer testified that when he interviewed Minkler he did not notice the smell of alcohol on Minkler's breath and Minkler did not appear to be intoxicated.  The officer testified that Paquette had been drinking that evening, but that she did not appear to be overly intoxicated.  The officer also testified that Chugg had been drinking and appeared to be heavily intoxicated.

About 20-25 minutes after Paquette's purse was stolen, Officer Francis Shipp located a black Thunderbird with a red stripe parked on the shoulder of Boulder Highway that matched the description given by Minkler.  Officer Shipp made a U-turn and positioned his vehicle almost three feet behind the Thunderbird when the vehicle began moving north on Boulder Highway.  Officer Shipp then followed the Thunderbird with his lights off because he was alone and the vehicle was reportedly involved in an armed robbery.  The Thunderbird eventually exited Boulder Highway and gradually increased speed as it traveled through housing developments.  During this time, Officer Shipp reported to police dispatch that he was following a vehicle matching the description of the one used in Paquette's purse robbery, and he requested assistance.

The Thunderbird re-entered Boulder Highway traveling northbound when extra patrol cars joined the pursuit with lights and sirens activated.  Officer Shipp recognized that he now had assistance so he activated his lights and sirens.  However, the Thunderbird did not yield.  Officer Shipp accelerated to approximately 90 miles per hour but was unable to keep pace with the Thunderbird.  Another police vehicle, driven by Officer Jonathan Boucher, passed Officer Shipp as they both continued to pursue the Thunderbird.  The Thunderbird proceeded to speed through two red lights before turning onto a road that terminated in a fence, which was erected at the edge of a construction site.

By the time Officer Shipp had stopped his vehicle, Officer Boucher had his gun drawn on Mathew Neifeld who was standing near the

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[1]The summary of background facts is intended only as an overview of the underlying criminal case, in order to provide context for the discussion of the issues. Any absence of mention of specific evidence in this overview does not signify that this Court has overlooked or ignored the evidence. The Court makes no credibility findings or other factual findings regarding the truth of the evidence or statements of fact in the state court.

[2] The exhibits referenced in this order are found in the Court's record at ECF Nos. 9-12.

The jury trial for Petitioner and co-defendant Neifeld commenced on March 21, 2005. (Exhibit 10).  Before jury selection, defense counsel raised a concern regarding Nelson's leg shackles.  The court held that there was an indication of a criminal record and that the leg shackles would remain.  (*Id.*, at pp. 2-4).  Jury selection began.  (*Id.*).

Trial continued on March 22, 2005.  (Exhibits 11 & 13).  Defense counsel renewed the objection to Petitioner's leg shackles, believing that prospective Juror No. 7 had gazed down at them the day before.  (Exhibit 11, at pp. 3-8).  Counsel requested a new jury panel.  (*Id.*).  Counsel further stated a different court services officer was present with Petitioner, who had removed the shackles. The court found the first day of trial that Petitioner was told to keep his feet under the table and the court did not see how any of the jury members could see his feet, as there were three people blocking the view and that there was a skirt surrounding the defense table.  The court denied the request for a new jury panel.  (*Id.*).

On the third day of trial, the parties settled jury instructions.  (Exhibit 14).  The defense noted several objections to jury instructions provided by the court and the State, and also discussed the three proposed and rejected defense instructions.  (*Id.*, at pp. 138-39).  Following deliberations, the jury found Petitioner guilty of Counts 1-3 and Neifeld guilty of Counts 1-2.  (Exhibit 18).

On August 31, 2005, the State provided the court with documents to adjudge Petitioner as a habitual criminal.  (Exhibit 21).

On October 26, 2005, the court adjudged Petitioner to be a violent habitual criminal as to Count 2.  (Exhibit 23, at p. 12).  Petitioner was sentenced as follows: Count 1, conspiracy to commit robbery, 60-90 months; Count 2, robbery with the use of a deadly weapon, life with the possibility of parole after 120 months, with a consecutive and like term for the weapon enhancement; and Count 3, failing to stop on signal of police officer, 60-190 months, all counts to run concurrent to one another. (*Id.*).  A judgment of conviction was filed on November 4, 2005.  (Exhibit 24).

4

1    Petitioner appealed the conviction to the Nevada Supreme Court.  (Exhibit 25).  On

2   November 8, 2007, the Nevada Supreme Court affirmed the conviction.  (Exhibit 40); *Nelson v.*

3   *State*, 123 Nev. 534, 170 P.3d 517 (2007).  Petitioner filed a notice for rehearing, which the Court

4   denied.  (Exhibits 41 & 42).  Remittitur issued on March 21, 2008.  (Exhibit 43).

5    On January 22, 2009, Petitioner filed a post-conviction habeas petition in state district court.

6   (Exhibits 46 & 47).  On March 24, 2009, the state district court, ruling from the bench, denied the

7   petition.  (Exhibit 1).  On April 9, 2009, the state district court filed a written denial of the petition.

8   (Exhibit 51).  The court found the claims raised in the petition were previously considered and

9   rejected on direct appeal.  Therefore, the claims were precluded by the doctrine of the law of the

10   case.  (*Id.*).  Petitioner appealed the denial of his state habeas petition.  (Exhibit 53).  On October 7,

11   2009, the Nevada Supreme Court affirmed the dismissal of the petition.  (Exhibit 56).  The Nevada

12   Supreme Court found that most of the claims were identical to claims raised on direct appeal, and

13   therefore were barred by the doctrine of the law of the case.  (*Id.*) (citing *Hall v. State*, 91 Nev. 314,

14   315, 535 P.2d 797, 798 (1975)).  The Court further found all remaining claims barred as second or

15   successive pursuant to NRS 34.810(1).  (*Id.*).  Petitioner filed a notice for rehearing, which the Court

16   denied.  (Exhibits 57 & 58).  Remittitur issued on December 1, 2009.  (Exhibit 59).

17    On December 15, 2009, Petitioner dispatched his federal habeas petition to this Court.  (ECF

18   No. 1 & 5).  The federal petition contains six grounds for relief.  (*Id.*).  Respondents moved to

19   dismiss the petition as unexhausted.  (ECF No. 7).  By order filed February 25, 2011, the Court

20   denied the motion as to Grounds 1-5, allowing those claims to proceed, but dismissed Ground 6 for

21   failure to state a cognizable claim.  (ECF No. 17).  Respondents were directed to file an answer to

22   Grounds 1-5 of the petition.  Respondents have filed an answer.  (ECF No. 23).  The Court now

23   addresses the merits of the remaining grounds of the petition.

24   / / / / / / / / / / /

25   / / / / / / / / / / /

26

5

### III. Federal Habeas Corpus Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), at 28 U.S.C. § 2254(d), provides the legal standard for the Court's consideration of this habeas petition:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002).  A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade,* 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000) and citing *Bell v. Cone,* 535 U.S. 685, 694 (2002)).  The formidable standard set forth in section 2254(d) reflects the view that habeas corpus is "'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

6

principle to the facts of the prisoner's case." *Lockyer v. Andrade,* 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than merely incorrect or erroneous; the state court's application of clearly established federal law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409). In determining whether a state court decision is contrary to, or an unreasonable application of federal law, this Court looks to the state courts' last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001).

In a federal habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the burden set in § 2254(d) on the record that was before the state court. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011).

**IV. Discussion**

**A. Ground 1**

In Ground 1 of the federal petition, Petitioner claims that his Sixth, Fifth, and Fourteenth Amendment rights to a fair and impartial trial and due process were violated when he was in shackles on the first day of jury selection, but his co-defendant was not in shackles. (ECF No. 1-1, at pp. 3-7, 38-44). Petitioner alleges that on the second day of jury selection, one of his defense counsel stated that Juror No. 7 was looking at Petitioner's shackles the day before. (*Id.*, at p. 39). After further discussion the court refused to declare a mistrial, found insufficient evidence to question Juror No. 7 about his observations, and found insufficient evidence to remove Juror No. 7 from the jury panel, but agreed to remove Petitioner's shackles. (*Id.*, at p. 39-40). Petitioner alleges that the state district court failed to make the proper determination that the restraints were justified by a state interest. (*Id.*, at p. 40).

7

1    The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the

2  jury absent a trial court determination, in the exercise of its discretion, that they are justified by a

3  state interest specific to a particular trial. *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  Visible

4  shackles may only be justified by an essential state interest such as courtroom security and the risk of

5  escape. *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008).  The greater the intensity of

6  shackling, the greater the risk of prejudice. *Id.* at 1064.

7    Where shackling was not visible, there is no error. *Rich v. Calderon*, 187 F.3d 1064, 1069

8  (9th Cir. 1999).  Security measures may be employed when the circumstances dictate. *Illinois v.*

9  *Allen*, 397 U.S. 337, 343-44 (1970); *Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985);

10  *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003).  There is no error from brief or accidental

11  viewing of the defendant in restraints outside the courtroom. *Ghent v. Woodford*, 279 F.3d 1121,

12  1132-33 (9th Cir. 2002); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999).

13    A shackling claim is subject to harmless error. *Larson v. Palmateer*, 515 F.3d 1057, 1064

14  (9th Cir. 2008) (harmless error to require leg brace that did not impede movement for only two of six

15  days of trial).  Overwhelming evidence of guilt satisfies harmless error. *Cox v. Ayers*, 613 F.3d 883,

16  891 (9th Cir. 2010) (holding that evidence against petitioner was so overwhelming that the marginal

17  bias created by the shackles had no prejudicial effect on the guilty verdict or the sentence) (quotation

18  marks omitted).

19    In the instant case, on the first day of Petitioner's trial, prior to jury selection, defense counsel

20  raised the issue of his leg shackles.  (Exhibit 10, at pp. 3-4).  The court stated that there was an

21  indication that Petitioner had "quite a criminal record, and my indication to the guard was to leave

22  them on.  I don't know how the jury is going to see them as long as they stay under the table." (*Id.*,

23  at p. 3).  Defense counsel specifically stated for the record that seating at the counsel table was

24  arranged so that Petitioner would be placed behind the counsel table and his shackles would not be

25

26

8

1   visible to the jury pool.  (*Id.*, at pp. 3-4).  The court determined that Petitioner would remain

2   shackled.  (*Id.*, at p. 4).

3        On the second day of trial, defense counsel renewed the objection to Petitioner's leg shackles.

4   (Exhibit 11, at pp. 3-4).  Counsel informed the court that Juror No. 7 at one point gazed down at

5   Petitioner's shackles.  (*Id.*, at p. 4).  On this basis, counsel requested a mistrial, and asked the court to

6   strike the venire and obtain a new jury panel.  The court found that there were three people seated

7   between Petitioner and the jury, including a co-defendant, co-defendant's attorney, and one of

8   Petitioner's two counsel.  (*Id.*, at p. 5).  The court found that the desk at which Petitioner was seated

9   had side panels to the floor and that if Petitioner kept his feet under the desk, the shackles would not

10  be visible.  (*Id.*).  Then, after consulting with Court Services, the court ordered the shackles removed.

11  (*Id.*, at pp. 5-6).  As to Juror No. 7, the court found insufficient evidence to question the juror, to

12  remove the juror, to impanel a new jury, or to declare a mistrial.  (*Id.*, at p. 7-8).

13        In addressing this claim on direct appeal, the Nevada Supreme Court held:

14              Nelson argues that the use of leg bracelets, which may have been
                visible to at least one juror, undermined the presumption of innocence
15              and interfered with his ability to communicate with counsel.  Nelson
                also contends that because he was in shackles and his codefendant was
16              not, the jury was given the impression that he was more dangerous
                than his codefendant.

17
                During the first day of jury selection, Nelson entered the courtroom in
18              leg bracelets before the prospective jurors entered the courtroom.
                Nelson objected to the use of the leg bracelets during trial because the
19              jurors would likely be able to see and hear them.  The district court
                overruled Nelson's objection and stated that "the indication is that he
20              has quite a criminal record" and "I don't know how the jury is going to
                see [the leg bracelets] as long as they stay under the table."
21
                Prior to the second day of jury selection, Nelson reiterated his
22              objection to the leg bracelets and moved for a mistrial because,
                according to Nelson's attorney, juror number 7 was "at one point
23              gazing down at Mr. Nelson's bracelets."  The district court again stated
                that if Nelson wanted to hide the bracelets under the table, he could
24              have.  The district court then inquired of Court Services why the leg
                bracelets were necessary.  Notably, the district court even admitted that
25              it was not aware of Nelson's record.  Court Services responded that
                Nelson was not dangerous.  The court then sustained Nelson's
26

9

1    objection and had the leg bracelets removed but denied the motion for
     a mistrial.

2
     This court has recognized that a defendant has the right to appear
3    before the jury in the clothing of an innocent person because "[t]he
     presumption of innocence is incompatible with the garb of guilt."
4    [Footnote 21: Grooms v. State, 96 Nev. 142, 144, 605 P.2d 1145, 1146
     (1980); see also Estelle v. Williams, 425 U.S. 501, 504-05 (1976)
5    (holding that state cannot, consistent with due process and equal
     protection, require an accused to stand trial while wearing identifiable
6    prison clothes)]. The garb of guilt necessarily includes physical
     restraints as such restraints, like prison clothing, erode the presumption
7    of innocence. [Footnote 22: Hymon v. State, 121 Nev. 200, 207-08,
     111 P.3d 1092 (2005)]. Thus, as this court has acknowledged, the use
8    of visible restraints during trial is unconstitutional unless "justified by
     an essential state interest, such as courtroom security that is specific to
9    the defendant." [Footnote 23: Id. at 208, 111 P.3d at 1098 (citing Deck
     v. Missouri, 544 U.S. 622 (2005))]. "District courts are allowed
10   sufficient discretion to determine whether to physically restrain a
     defendant during the guilt phase of trial" after "carefully balanc[ing]
11   the defendant's constitutional rights with the security risk that the
     defendant poses." [Footnote 24: Id. at 207, 111 P.3d at 1098]. That
12   balance requires that a defendant be restrained only "as a last resort."
     [Footnote 25: Id.]. If the district court fails to balance the appropriate
13   considerations or abuses its discretion in ordering that the accused be
     restrained during trial, this court must reverse the conviction unless the
14   error was harmless beyond a reasonable doubt. [Footnote 26: Id. at
     210, 111 P.3d at 1099; Grooms, 96 Nev. at 144, 605 P.2d at 1146].

15
     In this case, the district court erred when it denied Nelson's request to
16   have the leg bracelets removed on the first day of jury selection
     because the court failed to weigh the defendant's constitutional rights
17   with any security risk. We conclude, however, that the error was
     harmless. Despite defense counsel's representations, there is no
18   evidence in the record that any juror actually saw Nelson wearing the
     leg bracelets. And Nelson was not made to walk in front of the jury
19   wearing the bracelets. Indeed, Nelson was free to keep the bracelets
     hidden under the table during the jury selection process. Thus, we
20   conclude that it is clear beyond a reasonable doubt that the limited use
     of leg bracelets during the first day of jury selection constituted
21   harmless error. [Footnote 27: omitted].

22   (Exhibit 40, at pp. 12-14).

23        In determining whether the imposition of physical restraints constituted prejudicial error, the

24   Ninth Circuit has considered: (1) the appearance and visibility of the restraining device; (2) the

25

26
                                              10

nature of the crime with which the defendant was charged; and (3) the strength of the state's

evidence against the defendant.  *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008).

Regarding the appearance and visibility of the restraining device, the record indicates that

Petitioner was not shackled in clear view of the jury.  Petitioner was in shackles for only the first day

and a brief time on the second day of trial.  The first day of trial, Petitioner's counsel stated that he

specifically arranged the seating at the defense table so that the shackles would not be visible to the

venire.  The state district court found that Petitioner could keep his shackles hidden behind the

defense table.  As found by the state district court, the defense table was set up with a skirt hanging

to the floor around the exterior of the table.  Petitioner would have had to intentionally show his leg

shackles to the jury panel.  There is no evidence that the shackles were visible to any jurors.  So long

as Petitioner stayed behind the counsel table as he was directed on the first day of trial, the shackles

were not visible.  By the time Petitioner testified on his own behalf in the defense portion of the trial,

the leg shackles had been removed.  (Exhibit 14, at p. 163).

As to the nature of the crimes charged, Petitioner was charged with conspiracy to commit

robbery, robbery with the use of a deadly weapon, and failure to stop on the signal of a police officer.

The charged crimes were of a violent nature.

As to the strength of the State's evidence against Petitioner, overwhelming evidence of

Petitioner's guilt was presented at trial.  Witnesses, including police officers, positively identified

Petitioner, his co-defendant, and the vehicle which they used in the commission of the crimes.  At

the end of trial, the jurors reached a verdict in less than one hour.  (Exhibit 4).  The jury found

Petitioner and his co-defendant guilty of the charges in the amended information.  (Exhibit 18).

Moreover, any constitutional error was harmless beyond a reasonable doubt, because the

shackling error, if any, did not contribute to the verdict.  *See Larson v. Palmateer*, 515 F.3d 1057,

1064 (9th Cir. 2008) (harmless error to require leg brace that did not impede movement for only two

of six days of trial).  Additionally, overwhelming evidence of guilt, as in the instant case, satisfies

11

harmless error.  *Cox v. Ayers*, 613 F.3d 883, 891 (9th Cir. 2010) (holding that evidence against petitioner was so overwhelming that the marginal bias created by the shackles had no prejudicial effect on the guilty verdict or the sentence).  To the extent that there was any error regarding the shackling of Petitioner for a portion of the trial, such error was harmless.

Finally, the factual findings of the state court are presumed correct.  28 U.S.C. § 2254(e)(1).  Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Federal habeas relief is denied as to Ground 1 of the petition.

**B.  Ground 2**

In Ground 2 of the federal petition, Petitioner claims that his Sixth and Fourteenth Amendment rights were violated when the trial court refused to exclude or instruct Juror No. 7, who defense counsel claims she observed gazing down at Petitioner's leg restraint.  (ECF No. 5, at p. 7).  Petitioner relies on the facts alleged in Ground 1 of the petition to support his claim in Ground 2.

As determined in the discussion of Ground 1, there is no evidence that any of the jurors, including Juror No. 7, ever saw Petitioner's leg shackles during jury selection.  The state district court found that if Petitioner kept his legs under the table behind the table skirt where they belonged, the restraints could not be seen by the jury.  (Exhibits 10 and 11).  Defense counsel further stated that he deliberately arranged seating at the defense table the first day of trial so that at least three people sat between Petitioner and the jury.  (Exhibit 10).  The Nevada Supreme Court found that, despite counsel's statement, there was no evidence in the record that any juror actually saw Petitioner wearing leg shackles, that he was not made to walk in front of the jury wearing the shackles, and that he was free to keep the shackles hidden under the table during jury selection.  (Exhibit 40, at p. 14).

1    Petitioner fails to demonstrate that Juror No. 7, or any other potential juror, saw his leg

2    shackles on the first day of jury selection.  Further, the state district court found that, to pull Juror

3    No. 7 aside and ask him if he had seen the shackles would itself taint the selection process.  (Exhibit

4    11, at p. 8).  There is no constitutional requirement that the court question a potential juror when

5    there is no evidence that the juror is compromised in any way.  The factual findings of the state court

6    are presumed correct.  28 U.S.C. § 2254(e)(1).  Petitioner has failed to meet his burden of proving

7    that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of,

8    clearly established federal law, as determined by the United States Supreme Court, or that the ruling

9    was based on an unreasonable determination of the facts in light of the evidence presented in the

10   state court proceeding.  Federal habeas relief is denied as to Ground 2 of the petition.

11       **C. Ground 3**

12       Petitioner alleges that his due process rights were violated because the jury instructions he

13   submitted at trial on conspiracy and aiding and abetting were rejected by the trial judge.  (ECF No. 1-

14   1, at pp. 9).

15       To obtain federal habeas relief based on an improper jury instruction, Petitioner must

16   establish that the instruction so infected the entire trial that the resulting conviction violates due

17   process. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993); *Estelle v. McGuire*, 502 U.S. 62,

18   72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).  Demonstrating that an erroneous

19   instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a

20   state court's judgment requires the court to determine "whether the ailing instruction by itself so

21   infected the entire trial that the resulting conviction violates due process," not whether the instruction

22   is "undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe,* 431 U.S. at 154

23   (citations omitted); *Estelle v. McGuire,* 502 U.S. 62, 72 (1991).  In reviewing jury instructions, the

24   court inquires as to whether the instructions as a whole are misleading or inadequate to guide the

25   jury's deliberation. *U.S. v. Garcia-Rivera,* 353 F.3d 788, 791 (9th Cir. 2003) (citing *United States v.*

26

13

1   *Frega,* 179 F.3d 793, 806 n.16 (9th Cir. 1999) (internal citations omitted).  The question is whether

2   an instruction so infected the entire trial that the resulting conviction violated due process.  *Estelle*,

3   502 U.S. at 72.  An instruction may not be judged in isolation, "but must be considered in the context

4   of the instructions as a whole and the trial record."  *Id.*  Furthermore, jurors are presumed to follow

5   the instructions that they are given.  *U.S. v. Olano,* 507 U.S. 725, 740 (1993).  Even if an

6   instructional error is found, it is subject to harmless error review.  *Calderon v. Coleman*, 525 US.

7   141 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).  The question is whether the error

8   had a "substantial and injurious effect or influence in determining the jury's verdict."  *Id.*

9         In the instant case, defense counsel offered the following jury instructions, which were

10   rejected by the state district court:

11         (1) Absent an agreement to cooperate in achieving the purpose of a
             conspiracy, mere knowledge of, acquiescence in, or approval of that
12           purpose does not make one a party to conspiracy.

13         (2) In order for a person to be held accountable for a crime of another
             under the aiding and abetting theory of principal liability, the aider or
14           abettor must have knowingly aided the other person with the intent that
             the other person commit the charged crime.
15
           (3) An unarmed defendant, charged as an aider or abettor or co-
16           conspirator, cannot be held criminally responsible for use of a deadly
             weapon unless he has actual or constructive control over the deadly
17           weapon.  An unarmed defendant does not have constructive control
             over a weapon unless the State proves he had knowledge the armed
18           offender was armed and he had the ability to exercise control over the
             firearm.
19
20   (Exhibit 19; *see* Exhibit 14).  In addressing petitioner's claim that the trial court incorrectly rejected

21   his proposed jury instructions, the Nevada Supreme Court found and held:

22         Nelson argues that the district court erred when it declined to use his
           recommended jury instructions.  Petitioner contends that the
23         recommended jury instructions were not duplicative and were
           necessary to more fully explain aiding and abetting law.  Nelson
24         asserts that if the jury had received his proposed instructions, he could
           not have been convicted because there was no testimony that he knew
25         the gunman had a gun, or that he had made an agreement to aid and
           abet or cooperate with the gunman.

26

14

District courts enjoy broad discretion to settle jury instructions, and we will not overturn a district court's decision concerning a particular instruction absent an abuse of discretion or judicial error. [Footnote 35: Insurance Co. of the West v. Gibson Tile, 122 Nev. 455, 463, 134 P.3d 698, 702-03 (2006); Ringle v. Bruton, 120 Nev. 82, 90, 86 P.3d 1032, 1037 (2004).  Nelson offered the following proposed jury instructions: [Footnote 36: Nelson's first offered instruction concerned conspiracy. However, that instruction duplicated jury instructions 5, 6, and 7 submitted to the jury by the court].

> [Proposed Instruction 2] In order for a person to be held accountable for the crime of another under an aiding and abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the crime charged.

> [Proposed Instruction 3] Unarmed defendant, charged as an aider or abettor or co-conspirator, cannot beheld criminally responsible for the use of a deadly weapon unless he has actual or constructive control over the deadly weapon.  An unarmed defendant does not have constructive control over a weapon unless the State proves he had knowledge the armed offender was armed and he had the ability to exercise control over the firearm.

Instruction number 8, which was submitted to the jury, states, in pertinent part that

> A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime with the intention that the crime be committed.

> The State is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

In Sharma v. State, this court held that "in order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime. [Footnote 37: 118 Nev. 648, 655, 56 P.3d 868, 872 (2002).  We note that the robbery charged in count 2 is a general intent crime, see Hickson v. State, 98 Nev. 78, 79, 640 P.2d 921, 922 (1982), while the conspiracy to commit robbery charged in count 1 is a specific intent crime.  See generally Garner v. State, 116 Nev. 770, 786, 6 P.3d 1013, 1023 (2000), overruled on other grounds

15

by Sharma v. State, 118 Nev. 648, 56 P.3d 868 (2002).  However, in Bolden v. State, this court held that to convict a defendant of a general intent crime under the theory of vicarious coconspirator liability, the State is only required to prove that the crime in question was a "'reasonably foreseeable consequence'" of the object of the conspiracy. [Footnote 38: 121 Nev. 908, 923, 124 P.3d 191, 201 (1995)].

Additionally, this court held in Jones v. State that "'[c]onstructive or joint possession may occur only where the unarmed participant has knowledge of the other offender's being armed, and where the unarmed offender has . . . the ability to exercise control over the firearm.'" [Footnote 39: 111 Nev. 848, 852, 899 P.2d 544, 546 (1995) (alteration in original) (quoting Anderson v. State, 95 Nev. 625, 630, 600 P.2d 241, 244 (1979))].  This court also recognized that if an "'unarmed assailant has knowledge of the use of the gun and by his actual presence participates in the robbery, the unarmed offender benefits from the use of the other robber's weapon, adopting derivatively its lethal potential.'" [Footnote 40: Id.].

We conclude that proposed jury instructions 2 and 3 are duplicative because they reiterate the principles of aider and abettor liability also discussed in jury instruction number 8.  Additionally, the proposed jury instruction number 3 is not the law in Nevada.  While Nelson contends that the proposed jury instruction number 3 states the law concerning an unarmed defendant charged with aiding and abetting an armed defendant, the instruction fails to recognize that an armed defendant with knowledge of the firearm who benefits from its use may be held liable for aiding and abetting the armed defendant. [Footnote 41: See id.].  Under Nevada law, an unarmed defendant who benefits from the firearm may be held criminally responsible for the actions of the armed defendant.  Because Nelson's proposed jury instructions are duplicative and misstate Nevada law, we determine that the district court did not err when it declined to use Nelson's proposed jury instructions.

(Exhibit 40, at pp. 17-20).  The factual findings of the state court are presumed correct.  28 U.S.C.

§ 2254(e)(1).  Petitioner fails to establish that the jury instructions, as given, were erroneous and so

infected the entire trial that the resulting conviction violates due process.  *See Henderson v. Kibbe,*

431 U.S. at 154; *Estelle v. McGuire,* 502 U.S. 62, 72 (1991).  Petitioner has failed to meet his burden

of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the United States Supreme Court, or

that the ruling was based on an unreasonable determination of the facts in light of the evidence

1   presented in the state court proceeding.  Federal habeas relief is denied as to Ground 3 of the

2   petition.

3       **D.  Ground 4**

4       In Ground 4 of the federal petition, petitioner alleges that his rights to due process and right

5   against cruel and unusual punishment were violated when he was sentenced to a higher sentence than

6   authorized by statute.  (ECF No. 1-1, at pp. 5-6).  Petitioner alleges that the purpose of the habitual

7   criminal statute, that of reform, was not met because he was charged and sentenced on his second

8   conviction while already incarcerated on another conviction.  (*Id.*, at p. 14).  Petitioner alleges that

9   the second prior offense, Case No. C17211X, was dismissed and only brought back at Nelson's

10  request in order to try to get a better deal on another action, and therefore, the two convictions should

11  only count as one for purposes of the habitual criminal statute.  Petitioner alleges that it was

12  erroneous for the state district court to find him a habitual criminal on Counts 1 and 3 when the State

13  only filed an enhanced adjudication on Count 2 for robbery with the use of a deadly weapon.  (*Id.*, at

14  p. 15).

15      A sentencing matter that is left entirely to the discretion of the judge is not a basis for federal

16  habeas corpus relief.  *See Souch v. Schiavo*, 289 F.3d 616, 623 (9th Cir. 2002).  Eighth Amendment

17  challenges to a sentence allow for only a limited proportionality review for sentence length.  Outside

18  capital punishment, a successful challenge to the proportionality of a particular sentence should be

19  exceedingly rare.  *Solem v. Helm*, 463 U.S. 277, 289-90 (1983).  Reviewing courts should grant

20  substantial deference to the broad authority that legislatures necessarily possess in determining the

21  types and limits of punishments for crimes.  *Id.; see Lockyer v. Andrade*, 538 U.S. 63 (2003)

22  (upholding California's consecutive 25 years-to-life sentence for petty theft with serious prior felony

23  convictions).  A constitutional violation will only be found in extraordinary cases.  *Harmelin v.*

24  *Michigan*, 501 U.S. 957 (1991).  The fact that a sentence is mandatory does not suggest that it is

25  cruel and unusual.  *Id.* at 995.  "Generally, as long as the sentence imposed on the defendant does not

26

exceed statutory limits, we will not overturn it on Eighth Amendment grounds." *United States v. Zavala-Serra*, 853 F.2d 1512, 1518 (9th Cir. 1988) (citation omitted).  The United States Supreme Court has found that a double sentence because of a qualifying prior was well within the range the Court has found to be constitutionally permissible.  *Monge v. California*, 524 U.S. 721, 729 (1998).

> In addressing this issue, the Nevada Supreme Court found and held:

> <u>Nelson's habitual criminal sentence was authorized by statute</u>

> The judgment of conviction states that Nelson was adjudicated under the "Large Habitual Criminal Statute."  While Nelson contends that he was improperly adjudicated with respect to count 2, robbery with the use of a deadly weapon, under NRS 207.010(1)(b), the State contends that Nelson was adjudicated under NRS 207.012(1).  The statutes are similar but contain a significant difference.  To be adjudicated a habitual criminal under NRS 207.010(1)(b), the State must prove that the defendant has been convicted of three prior felonies.  In contrast, NRS 207.012 indicates that the district court shall sentence a defendant convicted of certain offenses as a habitual criminal felon if two qualifying prior convictions are found.

> In this case, the State filed an amended information on the first day of trial to provide notice of its intent to seek enhanced adjudication for count 2 under NRS 207.012 and for counts 1 and 3 under NRS 207.010.  The amended information stated that Nelson had been previously convicted twice for robbery, and the State presented evidence of the two prior convictions.  The first robbery conviction occurred on June 18, 2001, and the second robbery conviction occurred on June 21, 2001.  The district court stated that it was sentencing Nelson under the "Large Habitual Criminal Statute."  While that statement lacks clarity, the sentences imposed are consistent with NRS 207.012 for count 2 and NRS 207.010(1) for counts 1 and 3, as the State had noticed the habitual criminal allegations in the amended information.  Accordingly, we conclude that the district court sentenced Nelson within the scope of the applicable statutes.

(Exhibit 40, at pp. 20-24) (footnotes omitted).  Regarding Petitioner's argument that the robbery convictions entered on June 18, 2001 and June 21, 2001, did not constitute two separate felonies, the Nevada Supreme Court further found that: "[B]ecause the convictions were entered on different days and there is no evidence to establish that they were part of the same act, transaction, or occurrence, the convictions represent separate felonies for the purposes of habitual criminal adjudication." (Exhibit 40, at p. 23, n.44).  The factual findings of the state court are presumed correct.  28 U.S.C.

18

§ 2254(e)(1).  Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's

ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the United States Supreme Court, or that the ruling was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  Federal

habeas relief is denied as to Ground 4 of the petition.

**E.  Ground 5**

Petitioner claims violation of his due process rights and his Sixth Amendment right to be

informed in writing of the offenses and elements charged, because the State provided insufficient

notice of what acts it intended to prove for the "endangering" element of the failure to stop on signal

of a police officer charge (NRS 484.348).  Petitioner further claims that the "endangering" element

of  the failure to stop on signal of a police officer charge is unconstitutionally vague.  (ECF No. 1-1,

at pp. 8, 17-18).

The State charged Petitioner by information with Count 3, failure to stop required on signal

of a police officer, as follows:

> Defendant ANTHONY TYRELL NELSON did, while driving a motor
> vehicle, to wit: a 1997 Ford, bearing temporary Utah License No.
> H93267, from Boulder Highway and Indios to Karen and Eastern,
> Clark County, Nevada, willfully, unlawfully, and feloniously fail or
> refuse to bring his vehicle to a stop, or otherwise flee or attempt to
> elude a peace officer in a readily identifiable vehicle of any police
> department or regulatory agency, to wit: Henderson Police Officers
> SHIPP and/or J. BOUCHER, after being given a signal to bring the
> vehicle to a stop, operate said motor vehicle in a manner which
> endangered, or was likely to endanger any person other than himself or
> the property of any person other than himself.

(Exhibit 5, at pp. 2-3).[3]

The sufficiency of an indictment or information is not the proper subject to a federal habeas

corpus petition unless the indictment or information is so deficient that the convicting court is

---

[3]  The State filed an amended information which added the habitual criminal charges but did not change Count 3.  (Exhibit 9).

deprived of jurisdiction. *DeBenedictis v. Wainwright*, 674 F.2d 841 (11th Cir. 1982); *In re Cardwell*, 256 F.2d 576, 577 (9th Cir. 1957) (federal courts on habeas corpus may only inquire into the validity of a state indictment when it plainly appears from the record that no crime was charged in the indictment).

The information in the instant case is not so deficient that the convicting court was deprived of jurisdiction. The information contains a statement of jurisdiction and informs Petitioner of the particular statutes he was charged with violating. (Exhibits 5, 9). Petitioner was informed of the manner by which the stop required was accomplished, that is, after officers Shipps and/or Boucher gave Petitioner a signal to bring his vehicle to a stop, and Petitioner continued to operate his vehicle in a manner that endangered or was likely to endanger any person other than Petitioner or the property of any person other than Petitioner. (*Id.*). Therefore, Petitioner was informed of the elements of the offense with sufficient clarity to apprise him of what to defend against. *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (information is not constitutionally defective if it states the elements of offense charged with sufficient clarity to apprise the defendant of what to defend against); *Nevius v. Sumner*, 852 463 (9th Cir. 1988) ("The principal purpose of an indictment is to provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense and plead double jeopardy in a later prosecution."). Petitioner's claim that the State provided insufficient notice of what acts it intended to prove for the "endangering" element of the failure to stop on signal of a police officer charge (NRS 484.348) is without merit and is denied.

Petitioner next asserts that the "endangering" or "likely to endanger" element of the failure to stop on signal of a police officer charge per NRS 484.348(3)(b) is unconstitutionally vague. The doctrine of vagueness is a subcategory of what the United States Supreme Court calls "imprecise laws." *City of Chicago v. Morales*, 527 U.S. 41 (1999). A law may be impermissibly vague when it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests. *Morales*, 527 U.S. at 52 (citing *Kolender v. Lawson*, 461 U.S. 352,

358 (1983)).  A statute cannot constitutionally be so vague that men of common intelligence must

necessarily guess at its meaning.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-114 (1972).  This

is so because the statute must give adequate warning of what activities it proscribes and must set out

explicit standards for those who must apply it.  *Id.* at 108.  "Vagueness may invalidate a criminal law

for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable

ordinary people to understand what conduct it prohibits; second, it may authorize and even

encourage arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. at 56

(citing *Kolender v. Lawson*, 461 U.S. at 357).

In the instant case, the Court finds that the term "endanger" or "likely to endanger" in NRS

484.348(3)(b) has a common sense meaning that men of ordinarily intelligence can understand.  The

information in the instant case contained sufficient facts as to the nature and cause of the charges to

allow Petitioner to prepare an adequate defense.  NRS 484.348(3)(b), as applied to Petitioner, is not

impermissibly vague because a person of ordinary intelligence should be able to discern that

traveling at a speed in excess of 90 miles and hour down a highway or street, running two red lights,

while eluding two police officers who both have sirens and lights flashing, would be deemed an

endangerment to other persons or likely to endanger other persons or property.

The Nevada Supreme Court considered and rejected Petitioner's claim of vagueness, as

follows:

> Nelson argues that the conviction for "failure to stop" under NRS 484.348(3)(b) is constitutionally unfair.  NRS 484.348(1) makes it a crime for the driver of the motor vehicle to fail to stop or otherwise flee from a police officer when signaled to stop:
>
>> [T]he driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a peace officer in a readily identifiable vehicle of any police department or regulatory agency, when given a signal to bring his vehicle to a stop is guilty of a misdemeanor.
>
> The offense becomes a felony under NRS 484.348(3)(b) when, in addition to failing to stop when signaled, the drive "[o]perates the

21

motor vehicle in a manner which endangers or is likely to endanger any person other than himself or the property of any person other than himself." Specifically, Nelson argues that the term "endangers" in NRS 484.348(3)(b) is unconstitutionally vague because the term is not defined and is inadequate to give a person fair notice of what conduct is prohibited or to restrain arbitrary enforcement of the statute. We disagree.

The constitutionality of a statute is reviewed by this court de novo. [Footnote 2: Zabeti v. State, 120 Nev. 530, 534, 96 P.3d 773, 775 (2004)]. In addition, statutes enjoy a presumption of validity, and the challenger has the burden of demonstrating their unconstitutionality. [Footnote 3: State v. Colosimo, 122 Nev. ___, ___, 142 P.3d 352, 355 (2006); Williams v. State, 118 Nev. 536, 546, 50 P.3d 1116, 1122 (2002)].

A statute is void for vagueness and therefore repugnant to the Due Process Clause of the Fourteenth Amendment if it fails to sufficiently define a criminal offense such that a person of ordinary intelligence would be unable to understand what conduct the statute prohibits. [Footnote 4: Colosimo, 122 Nev. ___, ___, 142 P.3d at 355; see also Kolender v. Lawson, 461 U.S. 352, 357 (1983); Sheriff v. Burdg, 118 Nev. 853, 857, 59 P.3d 484, 486-87 (2002); Woofter v. O'Donnell, 91 Nev. 756, 762, 542 P.2d 1396, 1400 (1975)]. In addition, a statute is constitutionally vague if it encourages arbitrary and discriminatory enforcement because it lacks specific standards. [Footnote 5: Colosimo, 122 Nev. at ___, 142 P.3d at 355]. However, "a statute will be deemed to have given sufficient warning as to the proscribed conduct when the words utilized have a well settled and ordinarily understood meaning when viewed in the context of the entire statute." [Footnote 6: Williams, 118 Nev. At 546, 50 P.3d at 1122; see also Colosimo, 122 Nev. at ___, 142 P.3d at 355]. Although "there may be marginal cases in which it is difficult to determine the side of the line on which a particular factual situation falls," such a limitation is not sufficient to determine that a criminal statute is unconstitutional. [Footnote 7: United States v. Petrillo, 332 U.S. 1, 7 (1947)].

Although several states have determined that similarly worded statutes are indefinite and vague, a majority have determined that the term "endangerment" is sufficiently specific to withstand constitutional scrutiny. [Footnote 8: omitted]. For example, in State v. Sarriugarte, the Oregon Court of Appeals rejected a constitutional challenge to an Oregon statute that proscribed driving a vehicle "'in a manner that endangers or would be likely to endanger any person or property.'" [Footnote 9: 674 P.2d at 82 (quoting Or. Rev. Stat. § 487.235(1) (1977) (repealed 1983)]. The court determined that this statutory language is "at least as informative about the conduct it proscribes and at least as capable of objective adjudicative application as are many standard civil or criminal jury instructions, e.g., those relating to negligence, recklessness and certain culpable mental states." [Footnote

22

10: Id. at 83].  Upon review of a similar statute, the Supreme Judicial Court of Maine held that when the statute is read to include as an element criminal negligence, which is defined as the lowest culpable state of mind, the statute withstands constitutional scrutiny. [Footnote 11: State v. Davis, 398 A.2d 1218, 1219 (Me. 1979)].  Finally, when addressing this issue, the New Jersey Supreme Court recognized that "'[w]here the legislative regulatory object is appropriate and the conduct intended to be prohibited is not fairly susceptible of definition in other than general language, there is no constitutional impediment to its use.'" [Footnote 12: Joas, 168 A.2d at 31 (quoting State v. New York Central Railroad Company, 116 A.2d 800, 803 (N.J. Super. Ct. App. Div. 1955)); see also Petrillo, 332 U.S. at 7].  We are persuaded by the majority position.

To violate NRS 484.348(3)(b), an individual first must flee from a police officer who is signaling the individual to stop his vehicle.  Next, the individual must operate his vehicle in such a manner that it endangers or is likely to endanger other persons or property.  The term "endangers," as used in NRS 484.348(3)(b), is not unconstitutionally vague when considered in the context of the entire statute.  The statute gives fair notice to people of ordinary intelligence that an individual is committing a felony when he or she drives in such a manner as to endanger persons or property while fleeing from a police vehicle with its lights and sirens activated.  Although innumerable specific acts could be listed that would constitute felonious behavior under this statute, the statute provides clear guidelines for an adjudicative body to determine whether a violation has occurred.  Additionally, an individual of average intelligence could easily discern whether he is endangering another person or property while fleeing a pursuing police vehicle.  As the Supreme Court of Massachusetts stated in Commonwealth v. Pentz, "[t]o endanger the lives and safety of the public by operation of an automobile on a public way is not an intangible and shadowy act.  It has specific relation to the possible contact with human beings." [Footnote 13: 143 N.E. 322, 324 (Mass. 1924)].  Thus, we determine that NRS 484.348(3)(b) is not unconstitutionally vague.

Nelson also argues that the State failed to establish that he endangered or was likely to endanger any person other than himself or the property of any person other than himself.  We disagree.

The State presented evidence that Nelson failed to stop on the signal of a police officer and fled from the officer while speeding in excess of 90 miles per hour through red traffic lights.  The jury could reasonably infer from this evidence that Nelson operated his vehicle in a manner that endangered or was likely to endanger the lives or property of others while fleeing from a police officer who had signaled him to stop. [Footnote 14: omitted].  The violation of a traffic signal indicating that a stop is required – at speeds in excess of 90 miles per hour – clearly creates the potential for violent contact with human

23

1

2

3

4

5

6

> beings and other vehicles.  Thus, we conclude that the State proved beyond a reasonable doubt that Nelson endangered other lives and property in violation of NRS 484.348(3)(b). [Footnote 15: Nelson also contends he was deprived of the right to due process because the information did not contain any facts to support the "endangering" element.  We reject this argument because Nelson was not prejudiced by any lack of specificity in the information.  See Watkins v. Sheriff, 87 Nev. 233, 236, 484 P.2d 1086, 1088 (1971).  In particular, the record reflects that Nelson was made aware of the specific details proving the endangering element during a preliminary hearing].

7

Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was

8

contrary to, or involved an unreasonable application of, clearly established federal law, as

9

determined by the United States Supreme Court, or that the ruling was based on an unreasonable

10

determination of the facts in light of the evidence presented in the state court proceeding.  Federal

11

habeas relief is denied as to Ground 5 of the petition.

12

**V.  Certificate of Appealability**

13

In order to proceed with his appeal, Petitioner must receive a certificate of appealability.

14

28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1;  *Allen v. Ornoski,* 435 F.3d 946, 950-

15

951 (9th Cir. 2006); s*ee also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001).  District

16

courts are required to rule on the certificate of appealability in the order disposing of a proceeding

17

adversely to the Petitioner or movant, rather than waiting for a notice of appeal and request for

18

certificate of appealability to be filed.  Rule 11(a) of the Rules Governing Section 2254 and 2255

19

Cases.  Generally, a petitioner must make "a substantial showing of the denial of a constitutional

20

right" to warrant a certificate of appealability.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S.

21

473, 483-84 (2000).  "The petitioner must demonstrate that reasonable jurists would find the district

22

court's assessment of the constitutional claims debatable or wrong."  *Id.* (*quoting Slack*, 529 U.S. at

23

484).  In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the

24

issues are debatable among jurists of reason; that a court could resolve the issues differently; or that

25

the questions are adequate to deserve encouragement to proceed further.  *Id.*  In this case, no

26

reasonable jurist would find this Court's denial of habeas relief debatable or wrong.  The Court therefore denies Petitioner a certificate of appealability.

**VI.  Conclusion**

**IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus is **DENIED IN ITS ENTIRETY**.

**IT IS FURTHER ORDERED** that petitioner is **DENIED A CERTIFICATE OF APPEALABILITY.**

**IT IS FURTHER ORDERED** that the Clerk **SHALL ENTER JUDGMENT ACCORDINGLY.**

Dated this 15th day of October, 2013.

UNITED STATES DISTRICT JUDGE